# UNITED STATES DISTRICT COURT

for the
Eastern District of Wisconsin

In the Matter of the Search of:

ONE LG CELLULAR TELEPHONE GRAY IN
COLOR, CURRENTLY LOCATED AT BROWN
COUNTY DRUG TASK FORCE, State and Eastern
District of Wisconsin

)
)
)
)
)
)

Case No. 20M759

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

Property described as: ONE LG CELLULAR TELEPHONE GRAY IN COLOR, CURRENTLY LOCATED AT BROWN COUNTY DRUG TASK FORCE, Green Bay, STATE AND EASTERN DISTRICT OF WISCONSIN, described in Attachment A, incorporated herein.

over which the Court has jurisdiction pursuant to Title 18, United States Code, Sections 2703 and 2711, there is now concealed:

See Attachment B, incorporated herein.

The basis for the search under Fed. R. Crim P. 41(c) is:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: which constitutes evidence of Title 21, United States Code, Sections 841 and 846, and Title 18, United States Code, Sections 922 and 924, conspiracy to distribute and possession with intent to distribute controlled substances and associated money laundering crimes, and firearm possession by prohibited person and in furtherance of drug trafficking.

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

12-02-2020
09:00 am

_____
Applicant's signature

Ryan Meader, FBI TFO
Printed Name and Title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim P. 4.1 by
TELEPHONE (specify reliable electronic means):
Date: 12/2/2020

_____
Judge's signature

City and State: Green Bay, Wisconsin

JAMES R. SICKEL , U.S. Magistrate Judge
Printed Name and Title

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

IN THE MATTER OF THE SEARCH OF
ONE **LG CELLULAR TELEPHONE
GRAY IN COLOR**, CURRENTLY
LOCATED AT **BROWN COUNTY DRUG
TASK FORCE, Green Bay, Wisconsin**

Case No. 20M759

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

I, Ryan Meader, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal
Rules of Criminal Procedure for a search warrant authorizing the examination of property—an
electronic device—which is currently in law enforcement possession, and the extraction from
that property of electronically stored information described in Attachment B.

2.      Your Affiant, Narcotics Investigator (N/I) Ryan Meader, is a state certified law
enforcement officer, currently employed as a Detective with the City of Green Bay Police
Department. Your Affiant has served continuously as a law enforcement officer in the State of
Wisconsin since 2002. Your Affiant as part of his employment with the Green Bay Police
Department is currently assigned to the Brown County Drug Task Force as a Narcotic's
Investigator. During your Affiant's time as a Law Enforcement Officer, he has received on the
job training and specialized training.  I am currently a federally deputized law enforcement
officer, under the authority and agreement from the Federal Bureau of Investigation, and
assigned as a Task Force Officer, to conduct drug investigations in violation of Title 21, United

States Code. As such, I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States, who is empowered by law to conduct investigation of, and make arrests for, controlled substance offense enumerated in Title 21, United States Code.

3. As part of the on the job and specialized training, your Affiant has received training in topics such as: case initiation, Act 79, asset forfeitures, body wires, buy / busts, controlled buys, clandestine labs, consent searches, cryptocurrency and the dark web, drug endangered children, drug recognition and identification, drug trends, evidence processing and handling, informant handling, interdiction training, interview and interrogations, investigative techniques, marijuana investigations, overdose death investigations, prescription pill diversion, search warrants and court orders, sources of information, surveillance, tactical considerations, technical investigation tools, and undercover operations. Additionally, I have received specialized training on drug interdiction in the areas of airports, busses, hotel/motel, parcels, and trains instructed by the El Paso Intelligence Center (EPIC). Forty (40) hours of specialized training in the investigation and clean-up of Clandestine Laboratories instructed by the Drug Enforcement Administration (DEA). Your Affiant is also a member of the State of Wisconsin Clandestine Laboratory Enforcement and Response Team.

4. I have prepared numerous affidavits for both state and federal search warrants to include title III wire, oral, and electronic communications intercepts; I have also been involved in the execution of numerous search warrants. I have received training in Working with Confidential Informants, and Interview and Interrogation. I have interviewed suspects and confidential informants about their experiences and knowledge of gangs, drug use, and distribution. Your Affiant has participated in the investigation of narcotics-related offenses, your

2

Affiant has interviewed users and traffickers of controlled substances obtaining information from them regarding the acquisition, sale, importation, manufacture and distribution of controlled substances. Through my training and experience, your Affiant is familiar with actions, habits, traits, methods, street names and other terminology utilized by abusers and traffickers of controlled substances. Your Affiant has participated in narcotic investigations which have included physical surveillance, execution of search warrants, undercover transactions, court-ordered wiretaps, analysis of phone records, and arrests of numerous drug traffickers.

5.     Your Affiant has been trained in the area of field testing and identification of controlled substances. Your Affiant has performed numerous field drug identification tests for most of the commonly encountered street drugs and had field tests independently corroborated by the Wisconsin State Crime Lab Analysts/Chemists.

6.     Through the aforementioned training and experience, your Affiant is familiar with the nature of drug trafficking, and the behavior and patterns of those involved in using and/or distributing controlled substances. Your Affiant is aware through their training and experience, that drug dealers, and drug users routinely, if not entirely, use cellular phones, and other electronic devices to make arrangements via telephonically, text message, or other means related to cellular phones, or some combination of all of the above to distribute drugs.

7.     Your Affiant knows that cellular phones, smart-phones, and other electronic devices are commonly used by narcotics traffickers, users, and others associated with narcotics trafficking in the furtherance of their illegal activities. These devices have evolved, and are now utilized with computer-like capabilities, hardware, and software. These types of electronic devices may include, but are not limited to: cellular phones, smart-phones, pagers, laptop

3

computers, desktop computers, and other devices capable of sending instant messages, text messages, e-mail, and any other electronic messages.

8. Accessing phone applications Your Affiant knows that cellular, and electronic devices are capable of downloading, and utilizing applications or "apps" in addition to sending and receiving calls and text messages. Applications are utilized in a similar fashion to that of standard cellular communications in that they are capable of sending and receiving communication records. Your Affiant knows that these applications are accessible through the cellular and electronic devices and that those involved in criminal ventures, especially narcotics distribution, commonly utilize these applications in addition to voice calls, and standard text messages to communicate with co-conspirators, and others involved in their criminal ventures. Information on these applications, which is accessible through the electronic devices, will yield similar evidence to that of standard communication records, including communication content, dates/times, locations, names, photos, videos, GPS locations, calls, call history, names and other relevant information. Examination of these applications, which are accessible through the cellular or electronic devices, is crucial in obtaining evidence which is stored on and accessible through the cellular or electronic device. In addition to being stored, and used at residences, narcotics traffickers, and users will utilize these computer-like devices when they are engaged in and/or furthering their illegal activities. Additionally, your Affiant knows that computers, and electronic systems, including cellular and electronic communications devices, are frequently used as an instrument in a criminal act or the fruit of a crime.

9. SIM Cards / SD Cards Your Affiant knows electronic communication systems can store information on internal or peripheral storage devices, including but not limited to: Subscriber Identity Modules (SIM cards), Secure Digital cards (SD cards), and other devices

4

such as flash memory cards. These cards can be used to store additional data associated with the mobile device including photographic images, videos, text files, and other digital data. Your Affiant knows that additional data contained within these files may also provide dates, times, locations, settings, devices used, and user attribution information. This data can be recovered forensically.

      10.     Your Affiant is aware that cellular service providers maintain customer records of cellular telephone usage at their facilities, both on-site and off, which may be useful to law enforcement in the course of a criminal investigation. Your Affiant knows that cellular service providers maintain certain records for a short period of time, and that after that time, the records are lost. Your Affiant is aware that subscriber information, incoming and outgoing call detail, cellular tower and toll information, phone-enabled GPS or locating devices, electronic serial numbers of phones and other identifiers are maintained by cellular service providers. Your Affiant is also aware that cellular service providers may maintain text message content, cellular connection records including incoming and outgoing call data, cellular tower and cellular site information and subscriber information including name, address, date of birth, phone numbers, other associated phone numbers or accounts which may, in some cases, also include the same information for those contacting or contacted by the subscriber of a particular telephone number serviced or held by that cellular service provider. Your Affiant is also aware that while cellular service providers may maintain the aforementioned information for a period of time that this same information, and additional information useful to law enforcement in the investigation of criminal activities, may be located directly on the electronic device itself or on the internal and/or external memory or storage devices associated with the electronic device. This information may

even be accessible on the physical device when the cellular service provider has purged or lost the information.

11.     During the course of your Affiant's career, possession and use of cellular telephones has expanded to the point that nearly everyone your Affiant has contact with owns or uses such a device. Your Affiant knows from forensic examinations of cellular telephones seized in the course of past investigations, as well as from interviews with confidential informants, suspects and your Affiant's fellow law enforcement officers, that individuals use cellular telephones to communicate with customers and sources of controlled substances. In your Affiant's general experience investigating alleged crimes, including investigations of this type, your Affiant has found that a review, analysis and forensic examination of electronic media may lead to the discovery of additional evidence and/or witnesses and/or targets. Under these circumstances, frequent and immediate access to the digital content may be necessary and is desirable.

12.     Your Affiant knows it is common practice for most people to rely heavily on the use of cellular phones for many aspects of their daily lives. People commonly use cellular phones to send and receive text messages, make voice calls, interact on social media, store contact information, store personal identifying data, maintain calendars or agendas, utilize maps or GPS functions, access the internet and take photographs and videos. Memory of these contacts, messages, and photographs is often stored in the memory of cellular phones or electronic devices. Often, location information is also stored within the phone or electronic device memory. Your Affiant is aware that a trained investigator can recover SMS messages, multimedia messages, electronic content and records of outgoing and incoming calls from the cellular telephones and that this recovery can include messages or other information the user believes is

6

deleted. Your Affiant has used information recovered from cellular telephones in past investigations to identify sources for controlled substances and customers of the phone's owner. Based on this, your Affiant believes that off-site examination of any cellular telephones recovered from the premises or any person therein is likely to lead to additional information or suspects unknown to your Affiant at this time. Persons who engage in the manufacturing, sale or distribution of controlled substances will often use cellular phones to store contact information of people involved in drug use and sales, use the phones to arrange drug transactions and use the phones to send and receive text messages and take photographs. Memory of these contacts, messages and photographs is often stored on the cellular phones.

13.    Your Affiant also knows that messaging and other device data can be stored in pictures through the use of screen shots, even if the original content has been deleted. Your Affiant has seen messaging and other data stored in this manner numerous times in the past. These screen shots would commonly be found in the photo storage areas or gallery of the device memory. Through the analysis of the electronic devices, the assigned telephone numbers and other user accounts can be obtained and later used to gather further investigative evidence such as call and SMS detail records, tower location data, GPS or other position data or locations, and social media activity. Your Affiant has successfully used information recovered from cellular telephones as evidence in past investigations and prosecutions.

14.    Based on your Affiant's training and experience, drug users and dealers commonly utilize smart phones, cellular telephones, computers, tablets, etc. to facilitate drug transactions using various ways of communication to include phone calls, text messages, social media accounts and various other communication applications such as Snapchat, Facebook, Facebook Messenger, Signal, Wickr, Instagram, Text now, Tiktok, Google Duo, Kik, Textme,

7

Groupme, Hangouts, Tinder, Backpage, Viber, WhatsApp and Twitter, as well as others of the thousands of third party applications. These communications and applications can quickly be accessed within seconds of one another and are commonly used jointly or in conjunction with one another during the same transaction, advertising, etc. This data is sometimes retrievable. It is common for distributors and purchasers of controlled substances to communicate over these apps in an attempt to thwart law enforcement's ability to recover their communications if their phones are accessed. The messaging on certain apps is deleted after opening the message or viewing the message and on others it deletes after a set time frame. Some installed applications that can be used to hide and even encrypt data and conceal specific data from detection. These applications are generally accessed by covert means known by the user and often require a PIN code, pattern, password, or a unique biometric feature such as a fingerprint. Your Affiant also knows that users sometimes hide contraband images and other content in other applications and folders such as calendars and games as a way to avoid detection. Certain apps also allow you to make phone calls through the app and share videos and pictures. Your Affiant is aware drug dealers and users commonly take, store, and share photographs/videos of drugs, the manufacture, distribution and use of them, drug paraphernalia, currency, firearms, locations, co-conspirators and drug associates using cellular telephones and other electronic devices. Your Affiant is aware that pictures of currency can be money obtained from distribution of drugs or money they intend to use to purchase drugs. They do this to send these pictures to customers or suppliers and to demonstrate they have the money/illegal drugs on hand to complete the transaction. Your Affiant is aware that searches of cellular telephones and electronic storage devices for the items described in this warrant may assist law enforcement with identifying drug sources and customers and identifying patterns of drug distribution.

8

15. Based on your Affiant's training and experience, web search histories and location information stored on cellular telephones and other electronic devices can help law enforcement identify patterns of controlled substance distribution, identify controlled substance sources and customers, and identify or confirm the identity of the individual(s) using the cellular telephone or electronic device.

16. Your Affiant is aware, based upon your Affiant's training and experience, that data stored on phones or other computerized devices can be easily transferred to other computerized or electronic storage devices, either manually or via cloud-based services. For example, if a photograph is stored on an individual's cellular phone, that same photograph may also be located on that individual's computer and/or other electronic media devices owned or possessed by that individual. Sometimes this process is automatic, whereby content from one device is automatically transferred to other devices owned or possessed by the same individual via cloud-based services. Based upon your Affiant's training and experience, files stored on one device are often located on other devices owned or possessed by the same individual due to manual or automatic transfers as described above. Furthermore, if a file is deleted from one specific device, it may still be recoverable from other devices.

17. Based on your Affiant's training and experience, your affiant knows that digital evidence of files either present on a cellphone, computer or electronic device at any given time or of files that had been present on the cellphone, computer or electronic device, even momentarily, but deleted is persistent in the sense that forensic examination of the devices hard drive may reveal evidence of all or part of the file still on the devices hard drive long after the file was present on the device or after it was affirmatively "deleted" by the user. This phenomenon applies to files of all types, including electronic mail messages, chat logs, image or

9

video files, text files, etc. Your Affiant is aware from your Affiant's training and experience that forensic examiners have located entire files or remnants of files on suspect devices months and even years after the file was received at or "active" on the suspect cellphone, computer or electronic device.

18. Your Affiant knows that a forensic examination of such a hard drive, smartphone, cellphone or electronic device can identify and retrieve such images or videos and chat or instant message logs, including those images or videos of drug use, manufacture or distribution, even if those images or videos have been deleted by the device/computer operator. Based on training and experience, your Affiant is aware, that the persistence of digital evidence described above was recognized by the United States Circuit Court of Appeals for the 7th Circuit in the case of *United States v. Seiver*, 692 F.3d 774 (7th Cir. 2012). The court (Judge Posner) described the information summarized above about the storage of digital/electronic evidence on digital storage media. The court concluded that because of the manner in which digital data is stored on storage media, specifically on computer hard drives, if there is evidence that a relevant file or contraband materials was once stored on the computer it remains a fair probability that digital evidence of all or part of that file or its contents will be recoverable from that smartphone/electronic device/computer hard drive despite the passage of long periods of time, all so that there will usually continue to be a "fair probability" that the smartphone/electronic device/computer hard drive contains such evidence despite the lapse of time between evidence that a file was located on a particular computer and the request to search that smartphone/electronic device/computer hard drive should very rarely prevent a reasonable conclusion that it is fairly probable that evidence of that file, in whole or in part, or similar ones will be present on the smartphone/electronic device/computer hard drive even months or years later.

10

19.     Your Affiant is aware, based upon your Affiant's training and experience, that mobile devices commonly have Global Positioning System (GPS) or similar geo-location sensors. These sensors may track the historical location of the device geographically and provide a historical record. Your Affiant also knows that these systems leave log files which can be recovered and used to locate a device's geographic location on a specific date and time.

a.     Historical location data is essential to prove that the suspect was at the crime scene on the dates and times alleged. Even if the suspect admits to being at the crime scene on the dates and times alleged, it is essential to corroborate their statements in the event their story changes.

b.     Since location data can be recovered from a forensic analysis of the suspect's phone, it is essential to also prove that the suspect was in complete control of the phone to show that the suspect was the person who was at the crime scene. This evidence can be obtained from searching the suspect's text messages, calls, photo albums and video albums, among other locations in the phone.

20.     Your Affiant is aware that individuals who possess phones use the phones to regularly communicate with friends, family members, co-workers and associates. Searching through the suspect's text messages will provide investigators with evidence related to who was in possession and control of the phone on the dates and times the messages were sent. Your Affiant is aware that individuals who utilize text messaging services often identify themselves, their locations, and other identifying information, even if these identifications are subtle in nature.

21.     Your Affiant is also aware that individuals who possess phones with photo and/or video capabilities often utilize the phones to take photographs and videos of themselves, friends,

11

family, locations, and other people, places and things that can identify who was in possession of the phone. It is essential to an investigation to obtain this information in the case a suspect claims someone else possessed or controlled the phone at certain times.

22.     Further, your Affiant is aware text messages, photographs, and videos can be deleted by the individual who controls the phone. These deleted messages, photographs and videos may still be recoverable by a forensic analysis of the phone. However, the deleted records may be hidden in a phone's memory, which is why a full, forensic search of the phone is required.

23.     Text Messages to provide timeline and context to crime Your Affiant is seeking evidence of text messages sent and received, including content if available. This evidence would assist the investigation by providing relevant context to the alleged crimes. For example, it will be relevant to determine if any text messages were sent or received immediately prior, during, or after the alleged crime(s). These messages can assist in the investigation by providing a timeline and context.

24.     Text Messages, Photos, and Videos to prove who was in possession of the phone Your Affiant is seeking to search the photographs, videos and text messages located on the phone. Your Affiant is aware, based upon your Affiant's training and experience, that individuals who own and/or possess cellphones often take photographs and videos of their daily lives. Locating these photographs and videos, over a period of time, is essential to show that the suspect had full control over the phone. Your Affiant is also aware that individuals who own or possess phones commonly utilize the phones to send text messages to family, friends and acquaintances. Suspects may claim that they shared the phone or that another person had access to the phone. By searching the photographs, videos and text messages, it is probable to believe

12

that your Affiant will locate relevant evidence that will allow investigators to determine who was in possession and control of the phone.

25. When Seeking Photos/Videos the ability to Search in Places Other than Album Your Affiant knows based upon your Affiant's training and experience, that photographs and videos taken from a mobile device may be stored or sent in numerous locations on a phone, including but not limited to photo albums, text message applications, individual text messages or other applications with storage capacity. If a user deletes the photograph or video from the phone, it still may be available to recover from other areas of the phone, including applications where the photo or video was duplicated, or by recovering deleted data from the phone. Your Affiant is aware that when an item is "deleted" on a phone, it is still recoverable in other locations on the phone.

26. Searching Old Data / Deleted Data Your Affiant knows that it is necessary to search live and deleted data recovered from a mobile device from when the mobile device was first activated to when a device was seized. This is specifically necessary to establish that a particular mobile device and any associated applications can be attributed to a particular user. Additionally, this full range of time may be necessary to identify communications, contacts, calendar entries, pictures, videos, location information (including chats, texts, web searches, GPS, navigation, maps, and other data) that may convey communication between parties and identify suspects, co-conspirators, associates, witnesses and other individuals who may have involvement or knowledge of crimes and to establish pre-planning, execution, and post event information of criminal activity. Without this information, it may not be possible to authenticate and understand events of a particular day and time in proper context and to attribute particular user or users of a mobile device and their associated applications in proper context.

13

27.     Your Affiant knows that searching cellular telephones, smart phones and electronic devices for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of mobile device hardware and software available requires even computer/mobile device experts to specialize in some system and its data. In any event, data search protocols are scientific procedures designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password protected files and mobile device data. Since mobile device evidence is extremely vulnerable to inadvertent or intentional modification or destruction (such as from external sources such as remote deletion of the mobile devices electronically stored data), a controlled environment is essential to its complete an accurate analysis and can take an extended period to complete.

28.     As part of your Affiant's role as a Narcotics Investigator, your Affiant utilizes confidential, reliable informants in undercover roles in order to gather intelligence information from persons involved in the crimes of possession, possession with intent to distribute, distributions of and/or conspiracy to commit the same of illegal controlled substances, in violation of Wisconsin State Statutes 961.41 and controlled substance offense enumerated in Title 21, United States Code.

29.     The information relating to drug and weapons violations described in this affidavit is predicated, in part, upon conversations with individuals in a position to be aware of the activities of RAMIREZ-MORALES and others known and yet unknown. These persons, referred to herein as CIs (Confidential Informants) and CSs (Confidential Sources), and CHSs (Confidential Human Sources) have provided valuable information about the illegal drug activities about members of the TCO and RAMIREZ-MORALES' associates and their distribution networks. The information provided by the CIs, CSs, and CHSs have proven to be

14

reliable as described below, and much of the information provided has also been corroborated through other investigative techniques such as surveillance and telephone toll analysis. A CI's and a CHSs identity is always known to law enforcement, and the CI and CHS agrees to provide information to law enforcement and oftentimes conduct controlled drug buys for law enforcement. A CS's identity is also generally known to law enforcement. But a CS usually wishes to provide information anonymously while not actively cooperating with law enforcement to the same extent as a CI and CHS.

30.     At various times during this investigation, the referenced CIs (1920, 1950, and 1967) have provided reliable information on the members, distribution, sources, money, weapons and vehicles utilized to further the business of the overall TCO. I or fellow investigators have been able to corroborate information provided by the CIs and CHS and have found the CIs and CHSs to be truthful and reliable in relation to the information provided on the business conducted by the TCO. Additionally, most of the CIs' information has been corroborated through independent investigations including controlled buys, interviews and recorded conversations. Some of that corroboration is further described below in the probable cause section of this affidavit.

31.     The identities of the Confidential Informants are known to me and are being kept confidential to protect their safety and the integrity of this and other investigations. The Confidential Informants and the Confidential Human Source received various forms of consideration during the course of this investigation. CI 1920 received monetary compensation. CI 1950 received consideration towards pending criminal charges, monetary compensation in exchange for services including participation in controlled buys and providing statements. CI 1967 received consideration towards pending criminal charges in exchange for services

15

including participation in controlled buys and providing statements. CHS 95868 is providing information to the FBI in exchange for a change in status of their immigration status.

*CI 1920*

32.    CI 1920 has prior felony convictions and was utilized in other matters where CI 1920's information was corroborated. For several reasons, case agents believe CI 1920 is reliable and credible. First, CI 1920 has been providing information since approximately August 2019. Second, CI 1920's information is substantially against CI 1920's penal interest. Third, the information provided by CI 1920 is consistent with evidence obtained elsewhere in this investigation where CI 1920 was utilized, and/or substantial portions of CI 1920's information have been corroborated through independent investigation, including recorded conversations, surveillance, information from other confidential sources, and subsequent controlled buys made by case agents. For example, CI 1920 informed case agents that RAMIREZ-MORALES used TARGET TELEPHONE-101 to contact CI 1920, which is confirmed by call detail records. CI 1920 has had an adequate opportunity to directly observe the events discussed and/or has heard conversations directly from the individuals discussed. CI 1920 has numerous narcotics convictions, and also convictions for theft, robbery, burglary, and receiving stolen property, as well as probation violations. Finally, CI 1920 has been paid in the past for information, however has provided this recent information without monetary compensation. For these reasons, I consider CI 1920 to be reliable.

*CI 1950*

33.    CI 1950's statements are believed to be reliable as they were both made against his penal interest and later corroborated by information gathered during the course of the investigation. Thus far, the information provided by CI 1950 has proven to be reliable and has

16

been corroborated by, among other things, physical surveillance activities, controlled narcotic buys, other confidential sources, information obtained from various public databases, and consensually-recorded conversations and other investigative techniques. CI 1950's information has never been found to be false or misleading. According to law enforcement databases, CI 1950 has been convicted of Operating While Intoxicated, Possession of Drug Paraphernalia, Possession of THC, Trespassing, and Bail Jumping. CI 1950 was cooperating in exchange for consideration on a Green Bay Police drug offense. CI 1950 is now cooperating in exchange for occasional monetary compensation. To date, CI 1950 has been paid $300 in exchange for his cooperation.

*CI 1967*

34.　CI 1967 has had an adequate opportunity to directly observe the events discussed and/or has heard conversations directly from the individuals discussed. CI 1967's statements are believed to be reliable as they were both made against his penal interest and later corroborated by information gathered during the course of the investigation. Thus far, the information provided by CI 1967 has proven to be reliable and has been corroborated by, among other things, physical surveillance activities, controlled narcotic buys, and other confidential sources, information obtained from various public databases, and consensually-recorded conversations and other investigative techniques. CI 1967's information has never been found to be false or misleading. CI 1967 is cooperating in exchange for consideration on a case investigated by the GBPD. To date, CI 1967 has not been paid any monetary compensation in exchange for cooperation. CI 1967 has a felony conviction along with misdemeanor convictions include; numerous narcotics convictions, and convictions for theft, robbery, burglary, and receiving stolen property.

17

35.     Your Affiant believes the information provided by (POLICE) to be truthful and reliable inasmuch as the information has been provided in the normal course of their duties in their capacity as law enforcement officers.

36.     Your Affiant believes the information provided by the Confidential Informant to be truthful and reliable inasmuch as you affiant has received numerous pieces of information from the Confidential Informant in the past (against penal interest) that your affiant has independently corroborated. Your Affiant wishes that the identity of the Confidential Informant remain confidential for the safety of the Confidential Informant and so that the Confidential Informant can continue to assist law enforcement officers in further investigations.

37.     Based on your Affiant's previous training and experience, people in general commonly use cell phones to communicate with each other. This is no different between drug users and dealers. This conversational data is commonly stored within the cell phone's memory system. Your Affiant believes there will be evidence of the distribution of controlled substances located on (SUBJECT)'s cell phones.

38.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

39.     The property to be searched is a LG cellular telephone gray in color, hereinafter the "Device." The Device has no known visible identifiable serial numbers. The Device is currently located within the Brown County Drug Task Force secure evidence storage in the City of Green Bay, Brown County, State and Eastern District of Wisconsin. It was seized from Jesus Reyes during his arrest on November 7, 2020, in the Western District of Wisconsin, as part of my investigation into the drug trafficking organization run by Carlos Ramirez-Morales.

18

40.     The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## **PROBABLE CAUSE**

*Informant Statements.*

36.     On approximately July 29, 2019, BCDTF NI Secor and I met with CI 1950 who identified Carlos RAMIREZ-MORALES as their cocaine supplier. CI 1950 told investigators that RAMIREZ-MORALES stated he recently obtained "some new stuff," meaning controlled substances.

37.     On several occasions in January 2020, and into June 2020, BCDTF investigators and I met with CI 1967 who identified RAMIREZ-MORALES, known as "COCO," as their supplier of cocaine, heroin, and marijuana. CI 1967 stated that they could continue to purchase cocaine from RAMIREZ-MORALES. CI 1967 identified RAMIREZ-MORALES from an unlabeled color photo as the person I know to be RAMIREZ-MORALES. CI 1967 identified RAMIREZ-MORALES' residence to be at 2811 University Avenue apartment #5 and the adjacent building (2813 University Ave) as his stash house for drugs. CI 1967 identified "Bobe," believed to be Adult Male 1, as the individual who resides at the stash apartment.

*Controlled Buys*

38.     As further described below, I directed several confidential informants in obtaining controlled buys of drugs from either RAMIREZ-MORALES or those under his direction. In each instance, I know the confidential informant was searched both before and after the controlled buy, was supplied an amount of pre-recorded money, and was met after the purchase so that the controlled substance could be turned over to me or other law enforcement. In each instance, the controlled substance purchased was field tested resulting in a positive test result. Surveillance

19

officers also observed RAMIREZ-MORALES or an associate on his behalf meet with the Confidential Informant in order to distribute the narcotic. The specific buys are as follows:

a. On December 12, 2019, shortly after 5:15 p.m., CI 1950 purchased 1.06 grams of heroin from RAMIREZ-MORALES in a Home Depot parking lot in the Green Bay area. Surveillance officers observed RAMIREZ-MORALES travel from his apartment in Green Bay to the Home Depot store in Bellevue, Wisconsin, where he met CI 1950 and provided him with heroin. During the transaction, RAMIREZ-MORALES told CI 1950 to use a small amount and to be careful.

b. On April 9, 2020, shortly after 6:30 p.m., RAMIREZ-MORALES directed CI 1920 to transport him to an apartment complex at 2051 Basten Street, Green Bay. CI 1920 parked in front of the apartment complex, a Puerto Rican male, known to CI 1920 as Adult Male 2, exited and spoke with RAMIREZ-MORALES who told him his bill was $1,200.00. RAMIREZ-MORALES removed a plastic bag from his coat containing a white powder that RAMIREZ-MORALES said was one ounce of heroin. CI 1920 observed RAMIREZ-MORALES then give the drugs to Adult Male 2. CI 1920 drove RAMIREZ-MORALES back to his apartment complex.

c. On April 29, 2020, shortly after 12:32 p.m., CI 1920 met RAMIREZ-MORALES at his apartment complex to purchase one gram of heroin. Once there, RAMIREZ-MORALES entered CI 1920's car and directed him to drive around the area. RAMIREZ-MORALES then provided CI 1920 with heroin before returning to his apartment complex.

d. On June 8, 2020, CI-1967 pre-arranged the purchase of 14 grams of heroin for

$800 from RAMIREZ-MORALES at his apartment complex. RAMIREZ-MORALES was observed walking eastbound in the parking lot of his apartment building (2811 University Avenue Green Bay, WI) carrying, what appeared to be, a plastic grocery bag. BCDTF investigators heard contact over the wireless audio transmitter (wire) speaking what was believed to be Spanish. At approximately 6:23PM, N/I Linsmeyer observed the vehicle exit the parking lot. Investigators then met with the CI turned who over the suspected heroin to me which was packaged in a knotted clear plastic baggie.

e. On July 22, 2020, CI-1967 pre-arranged the purchase of 28.6 grams of heroin for $2,000.00 from RAMIREZ-MORALES at 2811 University Avenue. The CI stated that the CI spoke with RAMIREZ-MORALES who stated that the heroin was already prepared. At approximately 5:20PM, N/I Meisner observed the CI arrive at 2811 University Avenue, heard conversation in Spanish over the wireless audio transmitter (wire), and approximately one minute later observed the CI leave the apartment area. The CI turned over the suspected heroin over to me which was packaged in a knotted clear plastic baggie. While with me and N/I Secor, CI-1967 stated he and RAMIREZ-MORALES walked to Adult Male 1's apartment in the 2813 building by his garage door. RAMIREZ-MORALES opened the garage door and went to a shelf on the left side of the garage and grabbed the heroin off of the shelf. RAMIREZ-MORALES told the CI that he had a lot of heroin left and still owes $8,000.00 for the heroin that he has. RAMIREZ-MORALES then told the CI that he also had marijuana and to ask the CI'S friend if they wanted any.

21

*Meetings with Reyes and additional CI statements.*

39.     On January 16, 2020, I believe RAMIREZ-MORALES drove his Chevrolet Malibu from Green Bay to the Wisconsin Dells, remained in the area for approximately 37 minutes, and then traveled directly back to Green Bay. The short-term travel suggests to me that RAMIREZ-MORALES met REYES to obtain drugs or exchange money. On this date, Facebook records show five Facebook communications between REYES (with user name Cartoon REYES) and RAMIREZ-MORALES (with user name Lebrom Ezaid Morales).

40.     On March 17, 2020, I believe RAMIREZ-MORALES again traveled from Green Bay to the Wisconsin Dells area, remained there for approximately 37 minutes before traveling back to Green Bay. The short-term travel from Green Bay indicates to me that RAMIREZ-MORALES was meeting REYES, to obtain drugs or exchange money. On this date, there were eleven Facebook communications between REYES and RAMIREZ-MORALES.

41.     Several informants indicated to me that RAMIREZ-MORALES has a drug source in the Wisconsin Dells area. Specifically CI 1967 informed me and other investigators on several occasions that RAMIREZ-MORALES is supplied heroin from a source in the Wisconsin Dells. As indicated above, RAMIREZ-MORALES sold heroin to CI 1920 on April 29, 2020, that I know is referred to as "Choco Fan" given its brown pliable sticky texture. CI 1920 and CI 1967 advised me that RAMIREZ-MORALES was having difficulties selling it. RAMIREZ-MORALES told CI 1967 he is planning to return the remaining seven ounces along with the money owed to obtain different heroin from the "Dells" meaning REYES.

42.     On April 28, 2020, CI 1967 told investigators RAMIREZ-MORALES has asked CI 1967 if they want to sell drugs for him. CI 1967 stated they know the guy who sells RAMIREZ-MORALES the heroin (REYES) is from the Wisconsin Dells and his brother used to

22

work at the tattoo shop at the Appleton mall (Fox River Mall). CI 1967 stated that they were with RAMIREZ-MORALES last summer when he stopped at this tattoo shop to pay by giving the brother the money. CI 1967 stated there was at least $5,000 in a McDonald's bag. CI 1967 stated they were with RAMIREZ-MORALES when the guy from the Wisconsin Dells (REYES) told RAMIREZ-MORALES to leave the money with his brother at the tattoo shop. CI 1967 believes the guy from the Wisconsin Dells has a lot of power because they have been told by RAMIREZ-MORALES this guy has got everything including heroin, cocaine, and anything else desired. RAMIREZ-MORALES also called the CI over a video chat (Facebook Facetime) recently and informed them he was mad because the heroin he had purchased from the Wisconsin Dells is sticky and can't be cut down. RAMIREZ-MORALES said everybody liked the heroin when he was getting it from Milwaukee because it had Fentanyl in it and it was like sand. Now this new stuff is sticky and he can't do anything with it (meaning cut it or make it not sticky). RAMIREZ-MORALES told them he could not make more money with this even though it is strong.

43.     On May 8, 2020, CI 1967 informed me they had spoken with RAMIREZ-MORALES over a video chat (Facebook Facetime) and RAMIREZ-MORALES told them he had just bought a bunch or Dormin (investigators are aware Dormin is a commonly used product to "cut" narcotics in order to increase the saleable quantity, in return increasing profit). RAMIREZ-MORALE is going to use this to cut the sticky heroin he has and to dry it up. RAMIREZ-MORALES told the CI he has 4 (four) ounces to dry and cut up.

44.     On June 4, 2020, CI 1967 told this investigator no one likes this heroin RAMIREZ-MORALES has because it is "sticky", its "Choco Fan" and people are not used to it so they don't want to buy it or use it. The CI said RAMIREZ-MORALES is going to send the

rest of what he has back to the guy in the Dells (REYES) along with the money and get different heroin. CI 1967 told me RAMIREZ-MORALES told them he has "like 7 oz he selling 1,700 each one of heroin".

45. On June 23, 2020, CI 1967 told me that on June 17, 2020, RAMIREZ-MOARLES told CI 1967 that he drove his motorcycle to the Wisconsin Dells area to meet Reyes for purposes of obtaining narcotics and then drove back home.

46. On July 12, 2020, CI 1967 contacted me and informed me they had spoken to RAMIREZ-MORALES at approximately 5:50pm and RAMIREZ-MORALES had informed them he had picked up 15 pounds of marijuana yesterday from the "guy in the Dells" (REYES) and wants to sell each pound of marijuana for $2,500. CI 1967 stated RAMIREZ-MORALES had called them on a video chat (Facebook Facetime). CI 1967 told me they could see RAMIREZ-MORALES was riding in a vehicle and someone else was driving but the video never identified the individual with RAMIREZ-MORALES. On July 15th, CI 1967 informed me RAMIREZ-MORALES only had 7 of the 15 pounds of marijuana left.

47. On July 21, 2020, CI 1967 stated RAMIREZ-MORALES is going to the "guy in the Dells" (REYES) and dealing with him for marijuana now. RAMIREZ-MORALES still owes money for the heroin he has but when it is paid for he will get more (heroin) from him. CI 1967 said the last time RAMIREZ-MORALES was down there (Wisconsin Dells) to buy marijuana, RAMIREZ-MORALES called the CI on "the camera" (referring to Facebook Facetime video calls) RAMIREZ-MORALES was showing the CI all of the guns at the house. Investigators believe the residence is one associated with JESUS REYES.

*Intercepted Communications between Reyes and Ramirez-Morales*

48. On July 15, 2020, pursuant to a court-approved wiretap on the cell phone of

24

RAMIREZ-MORALES (CRM), law enforcement intercepted phone calls with Reyes.

    a. The following conversation occurred at 12:45 PM:

JAR: Hello?
CRM: Hello? Are you coming down there or are you still in Madison?
JAR: Hello?
CRM: Hello? Can you hear me?
JAR: Yes.
CRM: Are you coming down from Madison now or...? Or...
JAR: [OV] I am, right now I am in Madison, like about 1:15 from here-I will take off from Madison. More or less.
CRM: Oh well, that's fine, to arrive from here more or less at that time. Where are you?
JAR: Uh... what is the... the middle point for us, for both of us? So I don't go all the way there!
CRM: Is it called Madison over there? To look.
JAR: Uh huh.
CRM: Give me time and I will tell you.
[End of conversation]

    b. The following conversation occurred at 12:54 PM:

JAR: [UI]llo.
CRM: [aside] Move your hand the hell out.
JAR: Hello.
CRM: Hello.
JAR: Yeah.
CRM: It is-- It's-- let's say, half way for you will be, more or less, a bit before-- almost to Fond du Lac.
JAR: Okay, so, I'll see you in Fund du Lac then?
CRM: Okay.
JAR: Huh?
CRM: All right. Because the thing is that the way, it's sh-- sh-- showing me three ways. There is one way that shows an hour and 14. Which is t--
JAR: Okay.
CRM: --to make it over there… It shows two hours and 20 to Madison.
JAR: All right. Then I'll see you--I'll see you in Fond du Lac.
CRM: Okay.
JAR: All right?
CRM: Okay.
JAR: All right.

    c. The following conversation occurred at 2:52 PM:

CRM: Talk to me, [UI]. [PH]

25

JAR: What's up, bro.
CRM: I'm--I'm about eight minutes from there.
JAR: Okay, so, um, where do you want to meet?
CRM: [UI] man, because I don't know [UI] Fond de Lac.
JAR: I don't know anything here. Um, let me... Here, I'm here looking for a place to park.
Let me see what I can find.
CRM: Okay.
JAR: Let me, now--now that--that [UI] I'll send you the--the location.
CRM: All right.
JAR: All right?

    d.  The following conversation occurred at 2:57 PM:

CRM:  Look, right now I'm in front of a Walmart, here in Fond du Lac.
JAR:   At Walmart, wait for me there, I'm on my way.
CRM:  Ok.
JAR:   Alright

    e.  The following conversation occurred at 3:03 PM:

JAR: [UI] Charles.
CRM: Listen, I parked on a Honda Odyssey [UI] a corner.
JAR: At a corner on Walmart.
CRM: [UI] center. [UI],
JAR: Where is it? Hello. Hello.
CRM: Hello.
JAR: Yeah, where are you saying?
CRM: I'm over here, where the um, plants are at. [UI].
JAR: Okay. Um, [UI].
CRM: Um, I'm on a parking [UI] the parking [UI] before getting here.
JAR: What was that?
CRM: Next to the entrance to a dealer [dealership] down here, I think I saw you there.
    Are you on a Ford?
JAR: Yes. What are you driving?
CRM: [UI].
JAR: [UI].
CRM: Yes, on the [UI], yes.
JAR: Okay.
CRM: [coughs]

49.    These conversations coordinated a money drop meeting between RAMIREZ-

MORALES and REYES. Investigators believe that RAMIREZ-MORALES made a payment

towards the narcotics (marijuana and heroin) that REYES had previously fronted to RAMIREZ-

26

MORALES. Investigators electronically and physically surveilled this short-term meet. After the meet, investigators terminated surveillance on REYES due to the counter surveillance maneuvers REYES was employing.

50.     On August 6, 2020, law enforcement intercepted the first of several calls this day from RAMIREZ-MORALES (CRM) to REYES (JAR).

    a.   The following conversation occurred at 1:01 PM:

RAMIREZ-MORALES advised REYES that the guy who has the barber shops in Texas is the boss of the person to whom he sent the money. RAMIREZ-MORALES told REYES that the boss sends things from there and then the guy, Manolo, goes by car to pick up the money from all the places and bring it back. RAMIREZ-MORALES tells REYES that Manolo is Puerto Rican, but that he does not know the boss's name. REYES asks RAMIREZ-MORALES to text him all the information he has, and that he will call someone from that area to see what they know, and if they know something, to knock on his door. RAMIREZ-MORALES advised REYES that those people have more than one barber shop in El Paso, Texas. Further, the boss is Puerto Rican and that they deal with someone from Juarez. RAMIREZ-MORALES tells REYES that the boss sells coke, has been in prison, and that the feds have knocked on the boss's door. RAMIREZ-MORALES tells REYES that supposedly the person they deal with in El Paso is a big shot, so REYES must know that person. REYES asks RAMIREZ-MORALES for his location. REYES states that his wife is already at the Walmart in Fond du Lac. RAMIREZ-MORALES states he will get there soon. REYES asks RAMIREZ-MORALES to call him once he is at the Walmart.

    b.   The following conversation occurred at 1:45 PM:

27

RAMIREZ-MORALES tells REYES that he is about 10 minutes away due to an accident on the road. REYES tells RAMIREZ-MORALES that his wife is in his truck, but he does not know where she is parked. RAMIREZ-MORALES tells REYES that there is money for two of the green stuff (marijuana) and a $1,000 bucks for the other stuff (heroin) for a total of "5."

    c. The following conversation occurred at 2:03 PM:

RAMIREZ-MORALES tells REYES that he is in a gold Malibu, with black rims, by the same spot as last time. REYES states that he will let her know.

51. I believe these conversations involve RAMIREZ-MORALES explaining how Manolo recently stole $60,000 from him. RAMIREZ-MORALES asked REYES for assistance in finding "Manolo's" boss in the El Paso, Texas area because REYES has connections to that city. REYES agreed to help RAMIREZ-MORALES locate "Manolo." These conversations also coordinated a money drop meeting between RAMIREZ-MORALES and REYES. Investigators believe that RAMIREZ-MORALES made a payment towards the narcotics (marijuana and heroin) that REYES had previously fronted to RAMIREZ-MORALES. Investigators electronically and physically surveilled this short-term meet. REYES was not present but sent his "wife" to pick up the money from RAMIREZ-MORALES. RAMIREZ-MORALES also advised REYES there is the money for two of the green stuff and a $1,000 for the other stuff, references two pounds of marijuana and payment towards previously purchased heroin.

52. On additional days in August, law enforcement intercepted telephone calls between RAMIREZ-MORALES and Reyes.

    The following conversation occurred on August 7th:

  a. REYES calls RAMIREZ-MORALES and says he talked to a male [UM] about what

28

RAMIREZ-MORALES has at his (RAMIREZ-MORALES') location and UM lowered the prices for REYES. REYES explains that the peanut butter was not lowered but the green crack [PH] was lowered to 1,000-2 [$1,200] and REYES will price it for RAMIREZ-MORALES at 1,000-5. [$1,500]. REYES will get three points out of it and tells RAMIREZ-MORALES that he- RAMIREZ-MORALES can raise it so he can earn something himself. Conversation occurred about the quality of peanut butter that REYES previously provided. REYES will talk to his connection about the peanut butter quality and will ask his connection to talk to his people. REYES stated he received a few complaints about the peanut butter from several areas. RAMIREZ-MORALES discussed the quality of the peanut butter then says he would rather work with Indola [PH] even if it is more expensive because it sells fast and it can be sold at 20 or 30. REYES sent a text to his friend in El Paso [UM1] and he-UM1 will be back on Tuesday, REYES will see what his friend says then. RAMIREZ-MORALES asks about REYES'S supplier [UM2] of the black thing. REYES has not heard from UM2 about that. REYES says he met a different person [UM3] in Chicago and RAMIREZ-MORALES says that if REYES is talking about the white thing RAMIREZ-MORALES can sell them in whole right away and tells REYES to get three or four whole ones (kilograms of cocaine) because he- RAMIREZ-MORALES will sell them in less than three days. REYES will talk to UM3 again to see if they can make arrangements. RAMIREZ-MORALES again tells REYES that he can sell it because he has lots of people.

The following phone call occurred on August 12th:

b. Reyes advised Ramirez-Morales that he would contact his friend in Texas to assist with recovering the money given to Manolo. Further, Reyes confirmed that Ramirez-Morales

29

would pay some of the money to whomever recovers it for him.

The following call occurred on August 14th:

c. Ramirez-Morales advised Reyes he is concerned for his safety if Manolo is located because Ramirez-Morales' money is owed to a drug dealer. Ramirez-Morales indicates he could be shot as a result. Reyes advised that he can provide a gun to Ramirez-Morales and recommends that Ramirez-Morales purchase an AR-15. Reyes stated he previously purchased two AR-15 rifles. Reyes also asked how much money Ramirez-Morales has collected from selling the "black stuff" [believed to be heroin] because Reyes wants to send a payment to Texas.

53. During the above call, I believe peanut butter references heroin and green crack references high-grade marijuana. REYES advised the green crack [PH] was lowered to "1,000-2" [$1,200] and REYES said "I'm leaving it to you at 1,000-5." [$1,500]. REYES advised that he will receive three points out of it and RAMIREZ-MORALES can raise the price so he can earn something himself. Both then discuss the quality of peanut butter [heroin] that REYES previously provided. REYES agreed to discuss with his source the quality of the peanut butter. REYES also advised that he met a different person [UM3] in Chicago and RAMIREZ-MORALES asked REYES if it was "about the white thing." REYES responded that it was and RAMIREZ-MORALES replied "Man, you can give those to me in full and I'll sell them all." I believe this conversation pertains to cocaine and RAMIREZ-MORALES' ability to immediately sell three or four kilogram quantities.

54. On August 21, 2020, Reyes and RAMIREZ-MORALES again discussed by telephone the sale of marijuana and heroin. Reyes advised that RAMIREZ-MORALES can return whatever controlled substance does not sell and it will be returned to the original supplier.

30

RAMIREZ-MORALES indicated he would travel the following day to meet Reyes. On September 4th and September 6th, REYES and RAMIREZ-MORALES again discussed RAMIREZ-MORALES' sale of marijuana and heroin. REYES requested payment from RAMIREZ-MORALES so that REYES can pay his supplier. They also made arrangements for RAMIREZ-MORALES to travel to meet REYES to make the payment.

55. On September 9, 2020, REYES and RAMIREZ-MORALES discussed via cell phone a break-in to a storage facility used by RAMIREZ-MORALES to store multiple pounds of marijuana. RAMIREZ-MORALES advised that he stored "four" at that location- believed to be in reference to four pounds of marijuana. Unbeknownst to RAMIREZ-MORALES, law enforcement obtained a search warrant authorizing them to search the facility resulting in the seizure of multiple pounds of marijuana. During the call, REYES told RAMIREZ-MORALES to find out what had happened because REYES needed to answer to his guy (source) and his guy needed to answer to other people. RAMIREZ-MORALES said he would pay REYES from selling the remainder of drugs he possessed.

56. On November 9, 2020, I arrested REYES at his place of employment in the Wisconsin Dells area. At the time of his arrest, REYES possessed a loaded handgun located in the waistband of his pants. REYES has multiple prior felony convictions and cannot lawfully possess a firearm. Further, intercepted telephone calls between RAMIREZ-MORALES, REYES, and others indicate that REYES provided a handgun to RAMIREZ-MORALES on or around August 22, 2020. REYES provided this handgun to RAMIREZ-MORALES in order for RAMIREZ-MORALES to protect himself and further his drug trafficking activities. RAMIREZ-MORALES then asked others for ammunition for the firearm. RAMIREZ-MORALES subsequently returned the firearm to REYES per CI 1967 on September 24, 2020. CI 1967 stated

31

RAMIREZ-MORALES would be getting the money he paid for the gun returned and put towards the narcotics debt owed to REYES.

57.     I know based upon my training and experience narcotics users and distributors will often times utilize multiple cellular telephones to conduct business and to separate their personal communications from their narcotics distribution. I also know narcotics users and distributors will often times discard telephones and their numbers or switch numbers and keep the same device in an attempt to thwart law enforcement investigations from collecting data and tracking the devices. Narcotics users and distributors will often times also register and activate their cellular telephones in their acquaintances names and addresses in an attempt to provide a layer of insulation from themselves and the device and its contents.

58.     The Device is currently in the lawful possession of the Brown County Drug Task Force. It came into the Brown County Drug Task Force's possession in the following way: during the arrest of REYES at the Alpha Red Tattoo and Barber shop where REYES identified the cellular telephone as belonging to him. Based on my investigation, I know that Reyes communications with RAMIREZ-MORALES as detailed above occurred using cell phone number (608) 316-5535. I do not know whether the Device to be searched is associated with that cell phone number or another cell phone number utilized by Reyes. If the Device is that cell phone number, in my view, overwhelming probable cause supports it search. If it is another cell phone number, I believe probable cause exists to search that phone. I know that drug dealers often use several cell phone to communicate with sources of supply and customers. Further, drug dealers my use one of their cell phones to call another phone in their possession to retrieve messages or contact a third party associate temporarily using that phone. In addition I know drug dealers will "dump', meaning stop using and or destroy a cell phone if they believe law

32

enforcement has the telephone number or is aware of the device in an attempted to thwart law enforcements investigation. However in my experience data from cellular telephones are often times backed up on cloud servers (remote storage locations) allowing a person to reload/install the data (contacts, emails, pictures, etc) from the cellular telephone they disposed of or stopped using onto the new device. Even if the subject changed cellular telephone numbers and started utilizing a new device, there is a high probability data from the old device has been transferred to the new device. It is my belief the cellular telephone currently in the custody of the Brown County Drug Task Force, even if it is not assigned the telephone number (608) 316-5535, may still contain evidence associated to REYES and his narcotics distribution as further described in Attachment B.

59.     The Device is currently in storage at Brown County Drug Task Force. While the Brown County Drug Task Force might already have all necessary authority to examine the Device, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws. In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the Brown County Drug Task Force.

## TECHNICAL TERMS

60.     Based on my training and experience, I use the following technical terms to convey the following meanings:

> a.  Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication

through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

61. Based on my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

62. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

34

63.    *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

b.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

c.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual

35

information necessary to understand other evidence also falls within the scope of the warrant.

d.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

64.   *Nature of examination.*   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.   The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

65.   *Manner of execution.*   Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.   Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

66.   Your Affiant further requests, due to the ongoing nature of the investigation and other concurrent covert investigative activities, that law enforcement be relieved of their duty to the owner/operator of the cellphone to be searched or other subjects of this investigation that a search warrant for the cellphone had been authorized by the court and executed by law enforcement.

67.   That based upon evidence and information obtained by your Affiant, your Affiant believes that there is probable cause to believe that there is evidence contained in the property

36

described. Your Affiant prays therefore, that a search warrant be issued for the said property and to bring the same, if found, before a court of law to be dealt with according to law.

68. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

*12.02.2020*

*09:20 am*

Ryan Meader
Brown County Drug Task Force
FBI-Federally Deputized Law Enforcement
Officer

Sworn and attested to me by reliable electronic means pursuant to the requirements of Fed. R. Crim P. 4.1 (Telephone) this ___2___ day of ~~November~~ December, 2020.

US Magistrate Judge
JAmes Sickel

Notary Public
My commission expires: _____

37

## **ATTACHMENT A**

The property to be searched is a LG cellular telephone gray in color, hereinafter the "Device." The Device has no known visible identifiable serial numbers. The Device is currently located within the Brown County Drug Task Force secure evidence storage in the City of Green Bay, Brown County, Wisconsin.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.     All records on the Device described in Attachment A that relate to violations of 21 U.S.C. sections 841 and 846 (conspiracy to distribute and possess with intent to distribute controlled substances, and 18 U.S.C. Section 924( c) (possession of firearm in furtherance of a drug trafficking offense) that involve Jesus Reyes, Carlos Ramirez-Morales and others since June 2019 and continuing to November 9, 2020, including:

    a.   lists of customers and related identifying information;

    b.   types, amounts, and prices of drugs and/or firearms trafficked as well as dates, places, and amounts of specific transactions;

    c.   any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

    d.   any information recording Jesus Reyes' schedule or travel from June 2019 to November 9, 2020;

    e.   all bank records, checks, credit card bills, account information, and other financial records.

    f.   Photographs, video or other communications between participants in the drug trafficking organization, or of property acquired in the distribution of drugs or money laundering as well as images of controlled substances and/or firearms.

    g.   Evidence indicating the subscriber's state of mind as it relates to the crime under investigation;

h. Evidence that may identify any co-conspirators or aiders and abettors, including records that help reveal their role or whereabouts.

i. Evidence that may corroborate other seized or discovered evidence and information, already seized or may yet to be seized.

2. Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

2